**NOT FOR PUBLICATION**

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ZOFIA LEJA, individually and as administrator of the Estate of KAZMIERZ LEJA,<br><br>        Plaintiff,<br><br>v.<br><br>SCHMIDT MANUFACTURING, INC., ET AL.<br><br>        Defendants. | Civ. No. 01-5042 (DRD)<br><br><br>**O P I N I O N** |

*Appearances by:*

CHASAN, LEYNER & LAMPARELLO, P.C.
by: Anthony V. D'Elia, Esq.
300 Harmon Meadow Boulevard
Secaucus, NJ 07094

    *Attorneys for Plaintiffs*

LOWENSTEIN SANDLER, P.C.
by: David W. Field, Esq.
65 Livingston Avenue
Roseland, NJ 07068

GORDON & REES, L.L.P.
by: Elizabeth F. Lorell, Esq.
89 Headquarters Plaza North
Suite 1209
Morristown, NJ 07960

    *Attorneys for Defendants*

**DEBEVOISE, Senior District Judge**

This matter arises out of an industrial accident on May 4, 2000. That day, decedent Kazimierz Leja suffered severe injuries when he attempted to open a bulk sandblasting unit ("the machine") manufactured by Defendant Schmidt Manufacturing, Inc. ("Schmidt") while the machine was still pressurized. Mr. Leja died of an alcohol overdose on March 25, 2008. Alleging that the machine was defectively designed and that the accident caused his eventual overdose, his widow, Plaintiff Zofia Leja, asserts claims against Schmidt for (1) wrongful death, (2) survivor benefits for damages suffered by Mr. Leja before his death, and (3) loss of consortium. In support of her design defect allegations, Plaintiff argues that the "camlock closure," the cover at the top of the machine, qualified as a "quick-opening or quick-actuating closure" under the 1995 edition of the American Society of Mechanical Engineers' Code ("ASME Code") – a list of industry standards on the design and manufacture of machines such as the one at issue in this case. That edition of the Code required manufacturers of devices that utilized such closures to install a visible or audible warning device in order to warn users not to open the closure while the machine was pressurized. Schmidt failed to include such a device on the machine at issue in this case, but argues that it was not required to do so because the camlock closure was not quick-actuating.

Currently before the Court are two Motions for Summary Judgment pursuant to Federal Rule of Civil Procedure 56 submitted by Schmidt. In the first, Schmidt contends that it is entitled to judgment as a matter of law that the industrial accident out of which this action arises was not the proximate cause of Mr. Leja's March 25, 2008 overdose, and Plaintiff's wrongful death claim should therefore be dismissed. In its second Motion for Summary Judgment,

2

Schmidt asserts that Plaintiff's claim that it defectively designed the machine must be dismissed for failure to submit evidence of a reasonable alternative design.

In addition to Schmidt's Motions for Summary Judgment, both sides have submitted Motions in Limine.  Plaintiff contends that (1) Schmidt should not be allowed to introduce evidence of the Mr. Leja's comparative negligence in operating the machine or the alleged failure by his employer, West Virginia Paint and Tank Company ("WVP"), to adequately maintain the device, (2) Schmidt should not be permitted to argue that it could have delegated its duty to install safety devices and warnings on the machine to purchasers or users of that device, (3) Plaintiff should be allowed to introduce testimony from the deposition of Robert Thompson, the former vice-president of Schmidt, in another action, and (4) the Court should rule that Schmidt was the "manufacturer" and/or "product seller" of the machine as defined by the New Jersey Products Liability Act ("NJPLA"), N.J. Stat. Ann. § 2A:58C-8, and is therefore subject to strict liability for defects in the design or manufacture of that device.[1]

Schmidt submitted a brief in which it opposed each of Plaintiff's Motions in Limine and added one of its own, arguing that it should be allowed to reference iterations of the ASME Code issued after 1995 (the year of the edition that applied at the time the machine was manufactured). In support of that contention, Schmidt notes that one of Plaintiff's engineering experts, Guido Karcher, specifically referenced portions of the 2001-2004 editions of the ASME Code in his expert report.  Additionally, one of Schmidt's experts, Robert F. Reedy, referenced the 1998 edition of the ASME Code in the portion of his report addressing Mr. Karcher's findings.  Mr. Reedy went on to argue that the post-1995 iterations of the ASME Code cited by Mr. Karcher were meant as clarifications of the 1995 edition, and therefore elucidated requirements that were

---

[1] Rather than dealing with the admissibility of any piece of evidence, the Plaintiff's fourth argument requests a judgment as a matter of law.  Therefore, it will be treated as a Motion for Summary Judgment and decided under the standard of review applicable to such motions.

applicable at the time of the machine's design and manufacture. Plaintiff opposes Schmidt's request to introduce post-1995 editions of the ASME Code on the basis that they are irrelevant to the question of whether the machine – which was manufactured prior to their publication – was defective, and argues that their introduction at trial would result in undue prejudice.

For the reasons set forth below, Schmidt's Motion for Summary Judgment on the wrongful death claim will be granted. Mr. Leja's death, which occurred on March 25, 2008, was caused by an overdose of alcohol. There is no reason to believe that the May 4, 2000 accident out of which this litigation arises was the cause in fact of Mr. Leja's decision to consume a lethal dose of alcohol on the date of his death. In fact, the Plaintiff acknowledges that Mr. Leja did not begin drinking heavily until almost seven years after the accident. Even if the accident was a cause in fact of Mr. Leja's death, his consumption of a lethal alcohol was unforeseeable and was at least partially attributable to intervening causes. Therefore, the Court finds that the accident was not the proximate cause of Mr. Leja's death, and will dismiss Plaintiff's wrongful death claim. Schmidt's second Motion for Summary Judgment – in which it argues that Plaintiff's design defect claim should be dismissed – will be granted to the extent that Plaintiff contends that the machine was defective because it did not include a "pop-up valve" or other device that would have prevented Mr. Leja from opening the camlock closure while the device was pressurized. Schmidt's request that Plaintiff's design defect claim be dismissed entirely, however, will be denied.

Plaintiff's Motion for Summary Judgment will be granted in part and denied in part. Schmidt will be declared a "manufacturer" and "product seller" under the NJPLA, but may argue that it is entitled to indemnification because a former Defendant, Sylvan Equipment Corporation ("Sylvan"), also fit those definitions and was primarily responsible for the May 4, 2000 accident.

Similarly, the Motions in Limine submitted by both parties will be granted in part and denied in part.

## I. BACKGROUND

The facts underlying this action are set forth in the Court's March 31, 2008 Opinion.  See Leja v. Schmidt Manuf., Inc., 2008 WL 906252 (D.N.J. 2008).  For the sake of brevity, the Court will incorporate by reference the "background" section of that ruling, and will refrain from revisiting the majority of the information set forth therein.  In order to add context to today's ruling, however, some facts are repeated below.

The machine at issue in this litigation is a sandblasting unit that operates by releasing an abrasive stream of pressurized gas and liquid.  It was custom-built in 1996 by Schmidt and leased by Sylvan, which acts as a machinery distributor, to L&L Painting Company ("L&L") for use in the removal of paint from a bridge.  When the machine proved inadequate for that task, Sylvan took it back from L&L and sold it to Mr. Leja's employer, WVP.

At the time of the May 4, 2000 accident, Mr. Leja had been working for WVP for several years.  Part of his duties at the company included refilling the liquid abrasive materials contained in the machine.  The process of doing so involved releasing tension built up by pumping air into the "pressure vessel," a segment at the top of the machine, by activating a "blow-down valve" located on the side of the unit.  After the valve was activated and the pressure released, Mr. Leja would then climb a ladder to the top of the machine and open the camlock closure.  That closure was secured by five T-bolts.  Despite the fact that WVP never provided Mr. Leja with written instructions on how to safely refill the machine, it is undisputed that he was aware of the procedure and had completed the process at least 100 times prior to his accident.

On May 4, 2000, however, Mr. Leja attempted to open the camlock closure without first releasing the pressure inside the machine by activating the blow-down valve. The result was disastrous: pressure stored inside the machine caused an explosion that propelled the lid of the camlock closure and several pieces of shrapnel upward into Mr. Leja's body. The injuries to his right arm were particularly severe, and required that the limb be amputated shortly after the accident.

At the time of the accident, the machine was missing several warning labels that Schmidt contends were in place when it was originally delivered to Sylvan. In particular, Schmidt claims that the machine originally included two sets of adhesive warning stickers – one attached near the ladder and the other near the camlock closure – warning users to depressurize the unit before opening the pressure vessel lid. In addition to the adhesive stickers, a metal plaque warning users to "[d]epressurize unit before any maintenance or loading" was attached to the machine. At some point before the accident, the adhesive stickers were removed.

On August 31, 2001, Mr. Leja and his wife Zofia – the current Plaintiff in this action – filed a Complaint against Schmidt and five unknown individual Defendants in the Superior Court of New Jersey. Schmidt removed the action to this Court based on diversity of citizenship on October 30th of that year. Subsequent to removal, the Lejas filed an Amended Complaint and Second Amended Complaint in which they added as Defendants Sylvan, L&L, and Bobcat of New York, Inc. ("Bobcat").[2] Pursuant to settlement agreements with the latter two companies, the Lejas voluntarily dismissed their claims against L&L and Bobcat on October 4, 2006 and January 16, 2007, respectively, leaving only Schmidt, Sylvan, and the five "John Doe" individuals as Defendants.

---

[2] Mr. Leja's original Complaint named USF Surface Preparation Group/U.S. Filter, Inc. ("US Filter") as a Defendant. His Amended Complaint included no reference to that company. Therefore, US Filter is no longer a party to this action.

In a tragic turn of events, Mr. Leja died of an alcohol overdose on the morning of March 25, 2008. After his body was discovered at approximately 1:30 that afternoon, it was transported to the Newark office of the New Jersey State Medical Examiner, where a toxicological examination revealed that Mr. Leja's blood alcohol content at the time of his death was .376 percent – an amount consistent with a lethal dose. See, e.g., Va. Polytechnic Inst. and State Univ., "Alcohol's Effects," http://www.alcohol.vt.edu/Students/alcoholEffects/index.htm; Univ. of Tx. at Austin, "Blood Alcohol Concentration," http://healthyhorns.utexas.edu/bac.html. Due to objections by Mr. Leja's family, the New Jersey State Medical Examiner refrained from performing a full autopsy, but based on the toxicology examination certified the cause of death as "chronic and acute ethanolism."[3] (Def.'s Br. Supp. Summ. J., Decl. of David W. Field ("Field Decl."), Ex. F.)

Mr. Leja's family hired Dr. Lone Thanning to perform a private autopsy, which was completed on March 27, 2008. Dr. Thanning initially concluded that Mr. Leja's death was the result of "heart failure" arising out of various heart and lung conditions that he suffered as a result of the accident. (Id. at Ex. E at 13.) After receiving the toxicology report of the New Jersey State Medical Examiner, however, Dr. Thanning revised her conclusion and found that Mr. Leja died due to "acute and chronic alcoholism." (Id. at Ex. D.)

On June 2, 2008, Plaintiff filed a Third Amended Complaint in which she asserted claims for (1) wrongful death, (2) survivor benefits for damages suffered by Mr. Leja before his death, and (3) loss of consortium. That iteration of the Complaint, which is now the operative pleading,

---

[3] The term "alcohol" is used by chemists to denote a family of substances whose molecular structures include chains of carbon atoms of varying length bonded to a combination of one hydrogen and one oxygen atom. There are four types: ethanol, methanol, butanol, and propanol. The "alcohol" referred to in common parlance and included in various beverages is ethanol. Thus, the Medical Examiner's reference to "ethanolism" was simply a more scientifically-exact way of referring to what a layperson would call "alcoholism."

named only Schmidt and Sylvan as Defendants.  Plaintiff voluntarily dismissed her claims against Sylvan pursuant to a settlement agreement on September 8, 2008.  Therefore, only her claims against Schmidt remain.

After allowing the parties to engage in supplemental discovery relating to the claims against Schmidt contained in Plaintiff's Third Amended Complaint, the Court on April 16, 2009 held a conference at which the parties agreed to a schedule for dealing with any outstanding issues that would have to be resolved prior to trial.  Pursuant to a May 12, 2009 Scheduling Order memorializing the agreement reached at that conference, the parties submitted the pending Motions on June 16th of that year.

## II.  DISCUSSION

As discussed above, there are five Motions currently before the Court – three Motions for Summary Judgment, two by Schmidt and one by Plaintiff, and two Motions in Limine, one of which was filed by each side.  Because a decision granting any of the Motions for Summary Judgment would alter the nature of the issues to be addressed at trial and thereby affect the evidentiary questions raised by the parties' Motions in Limine, the Court will address the former category of Motions before turning to the latter.

## A.  Motions for Summary Judgment

The pending Motions for Summary Judgment deal with three disparate issues.  In the first, Schmidt argues that it is entitled to judgment as a matter of law dismissing Plaintiff's wrongful death claim because the May 4, 2000 accident was neither the cause in fact nor the proximate cause of Mr. Leja's March 25, 2008 alcohol overdose.  In its second Motion for Summary Judgment, Schmidt contends that Plaintiff's design defect claim is barred insofar as that claim is premised on the failure to include a "pop-up valve" – a device that would have

prevented Mr. Leja from opening the machine while it was still pressurized by automatically sealing off the pressure vessel when he attempted to remove the lid – because the Plaintiff has not presented expert testimony on the feasibility of such an alternative design.  Plaintiff's Motion for Summary Judgment requests a declaratory ruling that Schmidt was the "manufacturer" and/or "product seller" of the machine as defined by the NJPLA, and is therefore strictly liable for any defects (as determined by the jury at trial) in the machine's design or manufacture.

> ### *i.      Standard of Review*

Summary judgment is proper where "there is no genuine issue as to any material fact and … the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party."  Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006).  For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law."  Id.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

The party moving for summary judgment has the burden of showing that no genuine issue of material fact exists.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When the moving party does not bear the burden of proof at trial, the moving party may discharge its burden by showing that there is an absence of evidence to support the non-moving party's case. Id. at 325.  If the moving party can make such a showing, then the burden shifts to the non-moving party to present evidence that a genuine fact issue exists and a trial is necessary.  Id. at 324.  In meeting its burden, the non-moving party must offer specific facts that establish a material dispute, not simply create "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

In deciding whether an issue of material fact exists, the Court must consider all facts and their reasonable inferences in the light most favorable to the non-moving party.  See Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).  The Court's function, however, is not to weigh the evidence and rule on the truth of the matter, but rather to determine whether there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  If there are no issues that require a trial, then judgment as a matter of law is appropriate.  Id. at 251-52.

### ii.      *Wrongful Death*

Under that standard of review, Schmidt's first Motion for Summary Judgment must be granted, and Plaintiff's wrongful death claim dismissed.  As discussed above, Mr. Leja died of a toxic overdose of alcohol consumed on March 25, 2008.  There is no evidence that his death was the result of longstanding alcoholism or any medical condition, such as cirrhosis of the liver, associated with such an addiction.[4]  To the contrary, Mr. Leja did not begin drinking heavily until roughly a year and a half before his death, when he started to engage in periodic "binge drinking."  See, e.g., (Pl.'s Br. Opp'n Mot. Summ. J. Wrongful Death 2-4); (Wiktoria M. Leja Dep. 45:5-13, Jan. 8, 2009); (Rafal Leja Dep. 21:6-20, Nov. 13, 2008.)  Dr. Thanning, one of Plaintiff's experts, "testified that there was no evidence of long term alcohol abuse in this case." (Pl.'s Br. Opp'n Mot. Summ. J. Wrongful Death at 4.)  Schmidt's experts agree; the company's principal medical expert noted during his deposition that Mr. Leja's medical records did not include any evidence of longstanding alcohol abuse or the liver damage that would occur under such circumstances.  (Michael Baden Dep. 63:17-64:10.)  In light of those facts, only one of Mr. Leja's drinking episodes is relevant to this case:  the one that took place on March 25, 2008, and resulted in his death from alcohol poisoning.

---

[4] In a draft Pretrial Order previously filed with the Court, Plaintiff acknowledged that Mr. Leja's March 25, 2008 death was caused by "alcohol consumed on that day."  (Field Decl., Ex. A at 24, ¶ 280.)

In order to prevail on her wrongful death claim, Plaintiff must demonstrate that the May 4, 2000 accident was both the cause in fact and proximate cause of Mr. Leja's decision to consume an excessive amount of alcohol on the day he died.  See, e.g., N.J. Stat. Ann. § 2A:31-1 (applying the same standard of causation as in negligence cases by allowing recovery where death was "caused by a wrongful act, neglect or default, such as would … have entitled the person injured to maintain an action for damages resulting from the injury"); United States v. Neadle, 72 F.3d 1104, 1119 (3d Cir. 1995) (Becker, J., dissenting) ("The notion of causation runs throughout the law … and it is generally understood to encompass two concepts.  A defendant's conduct must generally be both the 'cause in fact' and the 'proximate cause' of some harm before liability is imposed.").

"The requirement of cause in fact purports to be an empirical test of whether the defendant's conduct was a necessary antecedent to the harm at issue."  Neadle, 72 F.3d at 1119.  "Cause in fact questions are frequently stated in terms of the sine qua non rule:  but for the acts complained of, the injury would not have occurred."  McCabe v. Ernst & Young, LLP, 494 F.3d 430 (3d Cir. 2007).  In cases where the injury at issue may have derived from multiple causes, "defendant's negligence need not be the sole or primary factor producing the injury; it need only be a substantial factor," meaning that it increased the risk of injury in such a way that a reasonable person would regard it as a cause.  Verdicchio v. Ricca, 843 A.2d 1042, 1056-57 (N.J. 2004) (internal quotations and citations omitted).  "A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant."  Reynolds v. Gonzalez, 798 A.2d 67, 77 (N.J. 2002) (quoting W. Page Keeton, et al., Prosser & Keeton on the Law of Torts, § 41, at 259 (5th ed. 1984)).

Proximate cause, in contrast, is a more policy-based inquiry that requires a court to determine whether, even if the defendant's actions were a cause in fact, the plaintiff's injury was so remote and unforeseeable that the defendant should not be held liable.  Lynch v. Scheininger, 744 A.2d 113, 127 (N.J. 2000) (Proximate cause is "that combination of logic, common sense, justice, policy and precedent that fixes a point in a chain of events, some foreseeable and some unforeseeable, beyond which the law will bar recovery.") (internal quotations omitted).  Under New Jersey law, "[p]roximate cause has been defined as any cause which in the natural and continuous sequence, unbroken by an efficient intervening cause, produces the result complained of and without which the result would not have occurred."  Garrison v. Twp. of Middletown, 712 A.2d 1101, 1114 (N.J. 1998) (internal quotations omitted).  Thus, Plaintiff must not only demonstrate that the May 4, 2000 accident was more likely than not the cause in fact of her husband's March 25, 2008 death from an overdose of alcohol, but must also show that his consumption of a lethal dose of alcohol on the latter date was not attributable to unforeseeable intervening causes or so remotely connected to his accident that recovery should be barred.

Plaintiff has not met either of those burdens.  The only evidence submitted in support of her contention that the May 4, 2000 accident was the cause in fact of Mr. Leja's March 25, 2008 overdose is an expert report by Dr. David B. Brozyna, the psychiatrist who treated Mr. Leja during the period between the accident and his death.  In that report, Dr. Brozyna stated that Mr. Leja suffered from post-traumatic stress disorder, and concluded that his alcohol abuse was "an attempt to decrease the symptoms of anxiety and depression brought about by the accident and his injuries."  (Field Decl., Ex. G at 3.)  Elsewhere in his report, however, Dr. Brozyna identified several potential causes for Mr. Leja's excessive drinking that were unrelated to the accident, including (1) his children reaching maturity and leaving home, (2) a recent visit by family

members from Canada, and (3) the fact that Mr. Leja had met his daughter's boyfriend and his family for the first time just a few days earlier.  (Id.)  Accordingly, Dr. Brozyna's conclusion that Mr. Leja's excessive drinking on March 25, 2008 was attributable to the May 4, 2000 accident appears speculative and unreliable.  Since Plaintiff has provided no other evidence that Mr. Leja's death was the result of the May 4, 2000 accident and not the intervening causes identified by Dr. Brozyna, any determination to that effect by the jury at trial would necessarily be based on conjecture.  Therefore, the Court must grant summary judgment in favor of Schmidt and dismiss the wrongful death claim.  See Reynolds, 798 A.2d at 77 ("A mere possibility of such causation [in fact] is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant.").

Even if the Court accepted Plaintiff's contention that the May 4, 2000 accident was the cause in fact of Mr. Leja's March 25, 2008 overdose, the relationship between those events is so remote that the first cannot fairly be said to have proximately caused the second.  It is undisputed that Mr. Leja suffered from post-traumatic stress disorder during the entire period between his accident and death, but that he did not begin drinking to excess until late 2006 or early 2007.  As discussed above, there are various intervening causes that may have contributed to his alcoholism, including unforeseeable family matters that bear no relation to the accident.  In light of those intervening causes and the seven-year delay between the accident and Mr. Leja's development of a drinking problem, the Court finds that the May 4, 2000 accident was not the proximate cause of Mr. Leja's March 25, 2008 overdose.  See Garrison, 712 A.2d at 1114 (In order for a cause to be proximate, it must be part of a "natural and continuous sequence, unbroken by an efficient intervening cause, [that] produces the result complained of and without

which the result would not have occurred.")  (internal quotations omitted).  Therefore, the Court will grant Schmidt's first Motion for Summary Judgment and dismiss Plaintiff's wrongful death claim.

### iii.    *Design Defect*

Schmidt's second Motion for Summary Judgment appears to arise out of confusion as to the precise nature of the factual allegations underlying Plaintiff's design defect claim, and is easily resolved.  Schmidt argues that Plaintiff's claim is based on her assertion – which appeared for the first time in a draft Pretrial Order filed with the Court following the April 16, 2009 scheduling conference – that the camlock closure on top of the machine's pressure vessel "was defectively designed in that there was a safer alternative design (a pop-up valve as opposed to the 5 t-bolt closure)."  (Def.'s Br. Supp. Mot. Summ. J. Design Defect, Ex. 1 at 24, ¶ 4.)  That assertion, in turn, seems to be based solely on statements made by William J. Meyer, an engineer who is one of Plaintiff's experts on the issue of design defect, during his deposition.  During his testimony, Mr. Meyer presented what he characterized as a "rough sketch" of "an alternative type of closure that would be quick-actuating and would not allow opening while the unit is under pressure."  (Pl.'s Br. Supp. Mot. Summ. J. Design Defect, Ex. A at 414:11-15.)  He then stated that "I think there's things like that that exist," and noted that "it's similar to what another manufacturer, Clemco, uses on their designs."  (Id. at 414:18-415:5.)  Mr. Meyer made no reference to a "pop-up valve" or any similar device in his expert report.  Nor did either of the other two engineering experts, Guido Karcher and E. Patrick McGuire, on whose reports Plaintiff relies.  See (Def.'s Br. Supp. Mot. Summ. J. Design Defect, Exs. 7-10.)

To the contrary, the expert testimony and other evidence submitted by Plaintiff in support of her design defect claim is directed solely to the issue of whether Schmidt's failure to include a

visible gauge or other pressure-indicating device near the camlock closure that would have alerted Mr. Leja to the fact that the machine was still pressurized before he attempted to open it. See generally (Id., Exs. 5-10.)  Plaintiff admitted in her brief that Mr. Meyer's statements during his deposition relating to the feasibility of installing a "pop-up valve" were merely tangential to "the primary thrust of [his] testimony," which asserted that "the [ASME] Code required a pressure indicating device and audible/visible warning device at the top of the vessel."  (Pl.'s Br. Opp'n Summ. J. Design Defect 4 n.1.)  She reiterated that concession elsewhere, stating that the deposition testimony relating to "'pop-up valves' … did not constitute the primary design defect as alleged by Mr. Meyer or Plaintiff's other engineering expert."  (Id. at 2.)  Rather, she claims that "[t]here is ample evidence in this case … from which a jury could conclude that Schmidt defectively designed the bulk blasting unit in that it did not contain a pressure indicating device at the top of the pressure vessel."  (Id.) (emphasis added.)  Iin light of the fact that Plaintiff has not asserted a design defect claim based on Schmidt's failure to include a "pop-up valve" or submitted expert testimony in support of such a claim up to this point in the proceedings, the company's Motion for Summary Judgment will be granted insofar as it pertains to Plaintiff's statement in the draft Pretrial Order that the failure to install such a device on the machine constituted a design defect, and Plaintiff will be prohibited from making such an argument at trial.  See Lewis v. Am. Cyanamid Co., 715 A.2d 967, 975 (N.J. 1998) ("To succeed on [a] design defect claim" under the NJPLA, a plaintiff must "prove that a practical and feasible alternative design existed that would have reduced or prevented his harm."); Diluzio-Gulino v. Daimler Chrysler Corp., 897 A.2d 438, 441 (N.J. Super. App. Div. 2006) ("Expert testimony [on the issue of design defect] in conclusory terms is insufficient to meet that burden.").

Schmidt's Motion will be denied, however, to the extent that it contends that Plaintiff's design defect claim should be dismissed entirely.  That contention is premised on the company's argument that, because the defects alleged by Plaintiff  relate to warning devices, her claim is more properly classified under the auspices of "failure to warn" than "design defect."  <u>See</u> N.J. Stat. Ann. § 2A:58C-1 (outlining three theories under which a Plaintiff may recover in a product liability action:  (1) manufacturing defect, (2) design defect, and (3) failure to warn).  The categorization of Plaintiff's claim is unimportant – her cause of action arises under the same statute, requires the same standard of proof, and will result in the same damages regardless of whether she argues at trial that the machine was defectively designed because it did not include a visible and/or audible warning device near the top of the pressure vessel or that Schmidt failed to properly warn users of the danger of opening the machine while pressurized by failing to include such a device.  Therefore, Schmidt's request that Plaintiff's design defect claim be dismissed in its entirety in favor of her failure to warn claim will be denied.  Plaintiff may argue under either theory at trial, but must limit those arguments to the factual question on which she has produced expert testimony:  whether the inclusion of such a warning device near the top of the pressure vessel would have constituted a reasonable alternative design that would have prevented Mr. Leja's accident or reduced his injuries.

### iii.     *"Manufacturer" or "Product Seller" Liability*

In the third and final Motion for Summary Judgment currently before the Court, Plaintiff requests a declaratory ruling that Schmidt was a "manufacturer" and/or "product seller" of the machine as those terms are defined by the NJPLA.  The term "manufacturer" includes, in relevant part, "any person who designs, formulates, produces, creates, makes, packages, labels or

constructs any product or component of a product."  N.J. Stat. Ann. § 2A:58C-8.  A "product seller" is:

> [A]ny person who, in the course of a business conducted for that purpose: sells; distributes; leases; installs; prepares or assembles a manufacturer's product according to the manufacturer's plan, intention, design, specifications or formulations; blends; packages; labels; markets; repairs; maintains or otherwise is involved in placing a product in the line of commerce.

Id.

Schmidt clearly meets the criteria for classification as both a "manufacturer" and "product seller."  The company designed and assembled the components of the machine, thus making it a "manufacturer."  Id.  Moreover, Schmidt sold the machine to Sylvan, a distributor that Schmidt knew would place the machine in the line of commerce, and was therefore a "product seller."  Id.

There is some dispute, however, as to whether Schmidt is the only "manufacturer" or "product seller" in this case – a question that bears directly on one of the company's defenses, in which it asserts that Sylvan caused the accident by removing warning labels that were affixed to the machine at the time it was sold to L&L in 1996, but were not in place after the resale to WVP.  Plaintiff did not include any arguments relating to Sylvan's potential liability in her opening brief, but contended that Schmidt should be prohibited from arguing at trial that it is not liable for Mr. Leja's injuries because the camlock closure was manufactured by a third company, Tube Turns Technologies, Inc. ("Tube Turns"), and Schmidt's role in the machine's design was limited to assembling its component parts by attaching that closure to the pressure vessel.[5]  For

---

[5] Plaintiff asserts no claims against Tube Turns, which is now known as Sypris Technologies. On December 23, 2004 Schmidt filed a third-party Complaint in which Tube Turns was named as a Defendant.  On June 3, 2005, the Court granted Tube Turns's Motion to Dismiss the claims asserted against it by Schmidt for lack of personal jurisdiction pursuant to 12(b)(2).  Schmidt moved for reconsideration of that ruling, which the Court denied on August 15, 2005.  Thus, Tube Turns is no longer a party to this action.

the sake of simplicity, the Court will address the arguments relating to Tube Turns before turning to those involving Sylvan's potential liability.

Put simply, Plaintiff's contention that Schmidt should not be allowed to argue that Tube Turns was responsible, whether in whole or in part, for the May 4, 2000 accident is premised on an assertion that the portion of the machine manufactured by Tube Turns – the camlock closure – was not defective. Rather, Plaintiff claims that the defect in the machine arose from Schmidt's failure to include a visible pressure gauge or other warning device on the pressure vessel in close enough proximity to the closure that it would have warned Mr. Leja that the device was still pressurized before he opened it. Based on those assertions, Plaintiff argues that Tube Turns falls under the Supreme Court of New Jersey's ruling in <u>Zaza v. Marquess & Nell, Inc.</u>, 675 A.2d 620, 50-51 (N.J. 1996), that a manufacturer of a component part that was not dangerous in itself could not be liable for the failure by a company that purchased that part and assembled it with others to install safety devices on the finished product.

Schmidt claims, however, that an exception to <u>Zaza</u>'s general rule applies in this case. The exception holds that:

> [A] manufacturer or distributor of a component product is liable for the harm caused by the absence of a safety device in a finished product, when a plaintiff proves, by a preponderance of the evidence, that it was feasible and practical for such safety device to have been installed at the time the component product was within the control of the manufacturer or distributor.

> Alternatively, a manufacturer or distributor of a component product is liable for the harm caused by a defective finished product when: (1) such defect was caused by the integration of a defective component product into the finished product; or (2) the manufacturer or distributor of the component product substantially participates in the integration of the component product into the ultimate design of the finished product; and (i) the integration of the component

causes the product to be defective; and (ii) the resulting defective product is a proximate cause of the harm.

Boyle v. Ford Motor Co., 942 A.2d 850, 853-54 (N.J. Super. App. Div. 2008).

Schmidt's argument takes two parts.  First, it notes Plaintiff's contention that the camlock closure manufactured by Tube Turns was a "quick-actuating closure" as defined by the ASME Code – which requires that visible or audible warning devices be installed on pressurized machines that include such closures.  The company then contends that, if the jury finds that the camlock was a "quick-actuating closure," such a finding will compel the conclusion that it was the incorporation of the camlock that rendered the machine defective, and Tube Turns will therefore be liable.

Schmidt's argument rests on a misunderstanding of the holding in Boyle.  That case did not rule that the integration of a component part whose inclusion in a final product would necessitate the installation of warning devices rendered the manufacturer of the component part liable for the failure to install such devices.  To the contrary, it held that a manufacturer of component parts will be liable for the failure to install warning devices on a finished product only if (1) it is proven by a preponderance of the evidence that such devices could feasibly have been installed on the component part itself, (2) the "defect was caused by the integration of a defective component product into the finished product," or (3) the component part manufacturer "substantially participates in the integration of the component product into the ultimate design of the finished product."  Id. (emphasis added).  None of those circumstances are present in this case.  Schmidt has presented no evidence that it would have been feasible for Tube Turns to install a visible or audible warning device on the camlock closure itself.  Nor does Plaintiff contend that the camlock closure – the component part at issue – was itself defective.  To the contrary, her design defect claim is not premised on any failure by the camlock closure to

19

function as intended, but rather on Schmidt's failure to include a gauge or other warning device on the pressure vessel, which was not manufactured by Tube Turns.  Finally, there is no evidence that Tube Turns participated in the design of the machine or the integration of the camlock closure into that device.  Therefore, the Court finds that <u>Zaza</u>'s holding applies to Tube Turns, and Schmidt will be prohibited from contending at trial that Tube Turns was responsible as a "manufacturer" or "product seller" for the May 4, 2000 accident.

The relationship between Plaintiff's factual allegations and her failure to warn claim require the opposite result with respect to Sylvan.  As discussed above, Plaintiff did not include any arguments relating to Sylvan's potential liability in her opening brief.  Her decision not to do so is likely attributable to the fact that the Court ruled in its March 31, 2008 Opinion that Schmidt must be allowed to argue at trial that Sylvan's actions in removing adhesive warning labels from the machine before reselling it to WVP were the primary cause of Mr. Leja's injuries.  The Court specifically found in that ruling that, "[c]onsidering the evidence, a jury could reasonably infer that the absence of warning labels was a proximate cause of Leja's injuries."  <u>Leja</u>, 2008 WL 906252 at *4.  On the basis of that finding, it sustained Schmidt's cross-claim against Sylvan for indemnification.  <u>Id.</u> at *6 ("[I]f Sylvan is primarily liable for Plaintiff's injuries, then Schmidt will be entitled to indemnification." (citing <u>Ramos v. Browning Ferris Indus. of S. Jersey, Inc.</u>, 510 A.2d 1152, 1159 (N.J. 1986))).  In light of that ruling, the Court agrees with Schmidt's contention that it must be allowed to argue at trial that Sylvan was a "manufacturer" or "product seller" under the NJPLA and was primarily responsible for Mr. Leja's injuries.

**B.  Motions in Limine**

As discussed above, both parties submitted Motions in Limine.  Plaintiff argues that Schmidt should be barred from introducing evidence at trial of Mr. Leja's or WVP's comparative negligence in using and maintaining the machine or arguing that it was legally permitted to delegate its duty to install safety devices and warnings on that device to purchasers or users. Plaintiff also contends in her Motion in Limine that she should be allowed to introduce the testimony of Robert Thompson, a retired vice-president of Schmidt, in another product liability action involving the explosion of a machine similar to the one at issue in this litigation.  Mr. Thompson was unavailable for deposition in this case due to illness, and is now deceased.

In addition to opposing Plaintiff's arguments, Schmidt contends in its own Motion in Limine that it should be allowed to introduce post-1995 editions of the ASME Code as evidence at trial.  It also claims that, if Plaintiff asserts at trial that the camlock closure on the machine was a "quick-opening or quick-actuating closure" as defined by the Code, it should be allowed to present evidence that WVP did not perform proper maintenance on the device.  In light of the disparate issues presented by the parties' limine motions, the Court will address their arguments in turn.

         *i.*       ***Evidence of Negligence by Mr. Leja and WVP***

In arguing that Schmidt should not be allowed to present evidence of negligence by Mr. Leja or WVP, Plaintiff relies on the well-established principle that "[c]ontributory negligence is not a defense to a strict-liability action … when an employee is injured in an industrial setting while using a defective product supplied by the employer for its intended or foreseeable purposes."  Johansen v. Makita USA, Inc., 607 A.2d 637, 641-42 (N.J. 1992).  Based on that

rule, Plaintiff contends that any attempt by Schmidt to apportion blame for the accident by alleging negligence on the part of Mr. Leja or WVP should be prohibited.

Schmidt concedes that it may not use the defense of contributory negligence, but contends that it should be allowed to argue at trial that negligence on the part of Mr. Leja or WVP was the sole proximate cause of the accident.  In support of that claim, Schmidt notes several decisions in which New Jersey state courts ruled such evidence is admissible for the purpose of showing that the design defect in question was not the proximate cause of the plaintiff's injuries.  See (Def.'s Br. Opp'n Mot. Limine 4-6.)  As explained in one of those cases:

> This defense, actually a claim that the defendant's conduct was not a substantial contributing factor to the accident, merely focuses the jury's attention upon the plaintiff's duty to prove that defendant's conduct or defective product was a proximate cause of the accident.  It shifts causal blame to another who is not legally liable in the suit.  It may be the employee, a fellow employee or a defendant who has already settled.  It may even be the plaintiff who is protected by the … doctrine of employee non-liability for comparative fault.

Fabian v. Minister Mach. Co., Inc., 609 A.2d 487, 495 (N.J. Super. App. Div. 1992).

Plaintiff counters that, while such a defense is generally available, this case falls within an exception that prohibits a defendant in a product liability action from introducing evidence of an accident victim's negligence.  That exception, which was first articulated by the Supreme Court of New Jersey in Jurado v. Western Gear Works, 619 A.2d 1312, 1319 (N.J. 1993) (citations omitted), bars such evidence in situations where the court has determined as a matter of law that the product in question was defectively designed due to the defendant's failure to include a warning device that would have prevented the plaintiff's injuries, stating:

> If a court determines that a design defect exists solely because the manufacturer has failed to include safety devices, there is no proximate cause question of any moment left to consider.  The very reason for declaring the design defective was to prevent this kind of foreseeable misuse.  Proximate cause could not, in such a case, present an obstacle on the grounds of misuse.  To do so would negate the very reason for declaring the design defective in the first instance.

Plaintiff's argument that the exception enumerated in <u>Jurado</u> applies to this case depends on disputed factual assertions, and is therefore unavailing. First, the Court has not determined that the machine was defective. <u>Id.</u> (stating that the exception applies only "[i]f a court determines that a design defect exists solely because the manufacturer failed to include safety devices"). To the contrary, the question of whether Schmidt's failure to include a visible or audible warning gauge near the camlock closure was a design defect is one that will be decided by the jury at trial. Additionally, the jury will have to determine whether Mr. Leja would have noticed and heeded such a warning device. Plaintiff repeatedly contends in her brief that, if a visible or audible pressure gauge had been installed on the machine near the camlock closure, Mr. Leja would have noticed and heeded that warning. (Pl.'s Br. Supp. Mot. Limine 16) ("[I]f the unit had been properly designed, a pressure indicating device adjacent to the closure would have prevented Mr. Leja from attempting to open the closure. … If the vessel had contained a pressure indicating device … then Leja would not have attempted to open the closure without first depressurizing the vessel.") Plaintiff is entitled to a presumption that such a warning would have been heeded. <u>Sharpe v. Bestop, Inc.</u>, 713 A.2d 1079, 1085 (N.J. Super. App. Div. 1998). Schmidt may rebut that presumption, however, by offering evidence that Mr. Leja knew of the danger of opening the machine while it was pressurized, but mistakenly believed that he had already executed the blow-down procedure to release the pressure inside the machine, and therefore would not have looked at the pressure gauge before releasing the camlock. <u>Id.</u> at 1089. Thus, there are at least two factual questions that must be answered by the jury before the <u>Jurado</u> exception would apply: (1) whether Schmidt's failure to include a warning gauge constituted a design defect, and (2) whether Mr. Leja would have noticed and heeded such a gauge. In light of those questions, Schmidt must be allowed to introduce evidence of Mr. Leja's negligence at trial.

In contrast, Schmidt may not present evidence of WVP's negligence. To the extent that such alleged negligence is premised on WVP's failure to properly maintain the camlock closure, it is not relevant to Plaintiff's design defect claims. Schmidt correctly notes that, in some cases, an employer's conduct may constitute an intervening cause of the plaintiff's injury that relieves the manufacturer of a product from liability for defects in that product. Coffman v. Keene Corp., 628 A.2d 710, 723 (N.J. 1993). An employer's conduct is only relevant, however, when it "creates the defect that constitutes the proximate cause of the injury." Machalko v. Cooke Color & Chem. Corp., 451 A.2d 179, 186 (N.J. 1982) (ruling that an employer's action in rebuilding various parts of a machine did not relieve the manufacturer of liability for defects in the portions that were not rebuilt); compare with Brown v. U.S. Stove Co., 484 A.2d 1234, 1244 (N.J. 1984) (holding that employer's conduct in willfully removing safety devices created the defect at issue and therefore relieved manufacturer of device from liability for plaintiff's injuries).

The alleged design defect in this case – Schmidt's failure to include a visible or audible warning device on the pressure vessel near the camlock closure – could not have been caused by WVP's negligence maintenance of that closure. Schmidt's decision not to include such a warning device was made prior to WVP's purchase of the machine. Moreover, WVP's negligence in maintain the camlock closure could not have had any effect on Mr. Leja's injuries, as it does not appear that the accident was attributable to any malfunction in that closure. To the contrary, both parties acknowledge that Mr. Leja intentionally opened the closure, the only question is whether he would have refrained from doing so had there been a warning device on the top of the machine. Therefore, Schmidt may not argue at trial that WVP's negligent maintenance of the camlock closure was the cause of the May 4, 2000 accident.

ii.     **Delegation of Duty to Install Safety Devices**

Nor may Schmidt argue at trial that it should be relieved of liability because WVP should have installed a visible or audible warning on the machine.  It is well-established that "[a] manufacturer cannot delegate its duty to provide safety devices or warnings to a down-stream purchaser."  Fabian, 609 A.2d at 494.

Schmidt's argument to the contrary is based on the provision of the ASME Code that governs the design and operation of quick-actuating closures.  That section states:

> It is the responsibility of the User to ensure that the sensing and safety devices and equipment specified by the Manufacturer are properly installed before initial operation, and maintained during subsequent operation.
>
> […]
>
> The rules of this Division do not require these safety devices to be supplied by the manufacturer of the vessel or of the quick-actuating closure.

(Def.'s Br. Opp'n Mot. Limine, Cert. of Elizabeth F. Lorrell ("Lorrell Cert."), Ex. 2 at FF-2.) To the extent that portion of the ASME Code conflicts with New Jersey law as articulated by the courts of that state, this Court must follow the latter.  Therefore, Schmidt's argument that it was allowed to delegate responsibility for installing safety devices on the machine to WVP is barred.

Moreover, Schmidt's interpretation of the ASME Code does not apply to the factual circumstances of this case.  Even if that Code governed the company's duties under New Jersey law, WVP would have been required only to install and maintain "safety devices and equipment specified by the Manufacturer."  (Id.) (emphasis added.)  Having not specified that a visible or audible warning device should be included on the pressure vessel, Schmidt cannot argue that WVP was required to install such a device.  That point is made clear in a subsequent portion of the ASME Code, which states that "sensing and safety devices and equipment are integral and vitally important parts of the closure, and are to be furnished or specified by the manufacturer of

25

the vessel or the quick-actuating closure."  (Id. at FF-3.)  Therefore, Schmidt will be prohibited

at trial from arguing that, if the camlock closure is a "quick-actuating closure" as defined by the

ASME Code, its duty to install safety devices required for pressure vessels utilizing such

closures could have been delegated to WVP.[6]

### iii.    Thompson Testimony

In her final Motion in Limine, Plaintiff contends that she should be allowed to introduce

at trial the deposition testimony of Robert Thompson, a former vice-president of Schmidt, in

DeMas v. Schmidt, an earlier product liability litigated in California state court that involved the

explosion of a machine similar to the one at issue in this case.  Mr. Thompson was not able to

appear for deposition in this case due to illness, and is now deceased.  Thus, he is an

"unavailable witness" under Federal Rule of Evidence 804(a)(4) and his testimony in the prior

proceeding – a case in which Schmidt was named as a defendant and had both the opportunity

and a similar motive to develop the testimony through questioning as it would if Mr. Thompson

were able to appear in this matter – is admissible under the hearsay exception contained in Rule

804(b)(1).

Schmidt contends, however, that the Court should exclude Mr. Thompson's prior

testimony pursuant to Rule 401 because it is not relevant and Rule 403 because it is more

prejudicial than probative.[7]  The former contention is meritless.  Mr. Thompson testified that

Schmidt's decision to affix metal warning labels to its machines was made in response to

---

[6] The Court expresses no opinion on whether the camlock closure was or was not "quick-actuating" as defined by the ASME Code.  That question is one for the jury, and must be addressed by the parties at trial.

[7] Schmidt also argues that Mr. Thompson's testimony does not fall under the hearsay exception enumerated in Federal Rule of Evidence 807 because the interests of justice would not be served by its introduction.  Having already determined that Mr. Thompson's testimony fits one of the hearsay exceptions set forth in Rule 804, the Court need not address the applicability of Rule 807, and will therefore disregard that argument.  See Fed. R. Evid. 807 (noting that the rule applies only to "statement[s] not specifically covered by Rule 803 or 804").

evidence that buyers were removing the adhesive warning labels, and thus goes directly to the question of whether the warning labels on the machine in this case – two of which were adhesive and were removed by Sylvan – were adequate.  Moreover, Mr. Thompson testified that he believed Schmidt included warning labels at the top of its machines near the opening to the pressure vessel – the very area where Plaintiff argues there should have been a visible pressure gauge or other warning device.  Therefore, the Court finds that Mr. Thompson's testimony is relevant to both Plaintiff's design defect and failure to warn claims and Schmidt's defense that Sylvan was the proximate cause of the May 4, 2000 accident because it removed warning labels from the machine.

The question of whether Mr. Thompson's testimony should be excluded pursuant to Federal Rule of Evidence 403 is more complicated.  That rule gives a trial court broad discretion to exclude evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Fed. R. Evid. 403; <u>McKenna v. City of Philadelphia</u>, 582 F.3d 447, 461 (3d Cir. 2009) ("A trial court is afforded substantial discretion when striking a Rule 403 balance with respect to proffered evidence, and a trial judge's decision to admit or exclude evidence under [Rule] 403 may not be reversed unless it is arbitrary and irrational.") (citations and quotations omitted).  There is a substantial danger that Mr. Thompson's testimony would result in unfair prejudice to Schmidt, as it contains references to severe injuries – including decapitation in at least one instance – suffered by users of that company's machines in the prior litigation.  Moreover, the introduction of Mr. Thompson's testimony would likely lead to confusion and would be cumulative of the other evidence that the parties will submit at trial.  On the former point, the Court notes that Mr. Thompson's testimony

is far from decisive; he repeatedly stated that he did not know when Schmidt began including

metal warning plates on its machines and that he could not recall the process by which the

company developed the warnings contained in its handbook.  In light of Mr. Thompson's lack of

memory on those points, the probative value of his deposition testimony is limited at best.

Moreover, Plaintiff deposed at least four other witnesses – including the former president of

Schmidt, its former director of engineering, sales manager, and assembly foreman – that testified

regarding the warning labels used by the company.  While Plaintiff may view Mr. Thompson's

prior testimony on that point as being more favorable to her case, that consideration alone cannot

outweigh its prejudicial and cumulative character.  Therefore, Plaintiff will be prohibited

pursuant to Federal Rule of Evidence 403 from introducing Mr. Thompson's deposition

testimony in the <u>DeMas</u> matter as evidence at trial.

### iv.    *Admissibility of Post-1995 Versions of the ASME Code*

As discussed above, Schmidt submitted a Motion in Limine in which it argues that it

should be allowed to introduce at trial editions of the ASME Code published after 1995.  Both

parties concede that the 1995 edition provided the applicable standard of care for the design and

manufacture of bulk blasting units such as the one at issue in this litigation at the time the

machine was produced.  Schmidt notes, however, that Mr. Karcher referenced portions of the

2001-2004 editions of the Code in his expert report.

Plaintiff contends that the passing reference made by Mr. Karcher to post-1995 editions

of the Code does not render those editions relevant to this litigation.  In doing so, she points out

that Mr. Karcher's use of the 2001-2004 editions of the ASME Code was limited to one sentence

in his report, in which he addressed a type of camlock closure different from the one used on the

machine.  <u>See</u> (Def.'s Br. Supp. Motion Limine, Ex. 2 at 4-5.)  Furthermore, Plaintiff notes the

well-established principle that whether a product is defective is determined using "the existing level of technological expertise and scientific knowledge relevant to a particular industry at the time a product is designed." Cavanaugh v. Skil Corp., 751 A.2d 518, 520 (N.J. 2000).

In light of that principle, the Court finds that editions of the ASME Code promulgated after the machine was designed and manufactured are not relevant to the question of design defect, and will prohibit the parties from introducing evidence based on those editions at trial. The parties may introduce their expert reports, but will be required to redact the portions that reference the 1998 and 2001-2004 editions of the ASME Code. Their expert witnesses may testify on the question of whether the machine was defective under the provisions of the 1995 ASME Code. They may not, however, reference any clarifications or modifications to the 1995 ASME Code contained in later editions, as such clarifications or modifications would not have been available to Schmidt's engineers at the time the machine was designed and manufactured.

### III. CONCLUSION

For the reasons set forth above, the Court rules as follows:

(1) Schmidt's Motion for Summary Judgment on Plaintiff's wrongful death claim is GRANTED. Plaintiff's wrongful death claim is DISMISSED;

(2) Schmidt's Motion for Summary Judgment on Plaintiff's design defect claim is GRANTED in part and DENIED in part. Plaintiff may not argue that the machine was defective due to Schmidt's failure to include a "pop-up valve" or other device that would have precluded Mr. Leja from opening the machine while it was pressurized, but may continue to assert a design defect claim based on the company's failure to include a visible or audible warning device near the camlock closure on the top of the pressure vessel;

(3) Plaintiff's Motion for Summary Judgment is GRANTED in part and DENIED
in part.  Schmidt is declared a "manufacturer" and "product seller" under the
NJPLA, N.J. Stat. Ann. § 2A:58C-8.  Schmidt may argue at trial that it is
entitled to indemnification from Sylvan because that company was also a
"manufacturer" or "product seller" and was primarily responsible for the May
4, 2000 accident, but may not make such an argument with respect to Tube
Turns;

(4) The portion of Plaintiff's Motion in Limine asserting that Schmidt should be
barred from introducing evidence of negligence on the part of Mr. Leja or
WVP is GRANTED in part and DENIED in part.  Schmidt may introduce
evidence at trial that Mr. Leja's negligence was the cause of the May 4, 2000
accident because he was aware of the danger of opening the camlock closure
while the machine was pressurized and would not have noticed and heeded a
visible or audible warning of that danger, but may not argue that the accident
was caused by WVP's negligence in maintaining the machine;

(5) The portion of Plaintiff's Motion in Limine asserting that Schmidt should be
barred from contending that, if the camlock closure is a "quick-actuating
closure" as defined by the ASME Code, its duty to install safety devices
required for pressure vessels utilizing such closures could have been delegated
to WVP is GRANTED.  Schmidt is prohibited from making such an argument
at trial;

(6) The portion of Plaintiff's Motion in Limine requesting that she be allowed to
introduce the deposition of Robert Thompson, Schmidt's former vice-

president, in another product liability action involving the explosion of a

machine similar to the one at issue in this litigation is DENIED;

(7) Schmidt's Motion in Limine requesting that it be allowed to introduce

evidence drawn from editions of the ASME Code promulgated after 1995 is

DENIED.  The parties shall redact their expert reports to remove any

reference to post-1995 editions of the ASME Code before submitting those

reports as evidence at trial, and shall refrain from engaging in questioning that

will elicit references to post-1995 editions of the ASME Code.

The Court will enter an Order implementing this Opinion.




   **s/ Dickinson R. Debevoise**_____
DICKINSON R. DEBEVOISE, U.S.S.D.J.


Dated:  March 31, 2010